Beatrice Hardman, Guardian of the Estate of Susan Hardman, a Minor, and Beatrice Hardman, Individually, Plaintiffs-Appellants, v. Helene Curtis Industries, Inc., a Corporation, Defendant-Appellee.

Gen. No. 48,780.

First District, Fourth Division.
March 11, 1964.
Rehearing denied May 13, 1964.

43

James A. Dooley, of Chicago, for appellants.

Lord, Bissell & Brook, of Chicago (Forest L. Tozer, Jay M. Smyser and Richard E. Mueller, of counsel), for appellee.

MR. JUSTICE DRUCKER delivered the opinion of the court.

This is an appeal from a judgment on jury verdicts of not guilty.

Beatrice Hardman, both individually and as Guardian of the Estate of Susan Hardman, a minor, sued to recover for burns and bodily injuries alleged to have been incurred as a result of the use of a hair conditioning product manufactured and marketed by defendant under the name of Lanolin Discovery. A Second Amended Complaint was filed at the conclusion of plaintiff's proof, adding to the negligence counts, two counts based on an implied warranty and two on an express warranty. These latter four counts were taken from the jury.

Plaintiff purchased two cans of Lanolin Discovery in Iowa which bore a direction "Use after shampoos for snarl-free combing and 2 or 3 times a week to keep hair naturally beautiful." There was no warning of flammability on the can. On the morning of March 11, 1957, plaintiff used the product on the hair of Susan who was six years, nine months old. At noon, another Hardman daughter, Peggy, applied some more of it to Susan's hair.

Plaintiff's witnesses testified that Susan was seen in the early evening spraying Lanolin Discovery on her hair and the upper part of her cotton gingham dress, using the preparation as a perfume. A fourteen-year-old daughter, Sharon, testified that thereafter she saw Susan carrying a candle in front of her and heard a puff; after which she saw Susan afire on the upper part of her dress and in her hair; called her mother, and that they attempted to smother the fire and tore

45

off the burning dress; that later a four-inch piece of candle was found on the floor.

Plaintiff testified that on hearing screams she ran into the dining room and found that Susan's hair and dress were afire; that she extinguished the fire in the hair and dress with her hands, and with the help of her children tore the dress off, which was burning above the waist. Plaintiff and her daughter, Peggy, stated in their testimony that Susan's hair and ears were burned and that the bottom of the dress was not burned.

Plaintiff's doctor who examined Susan at the hospital following the accident testified that the hair was singed slightly and that there was no burn on the scalp; that the burned area was on the chest from about three finger-widths below her collarbone to about three finger-widths below the navel and extending to a line at the back of the armpit; that the burns also covered the front of both arms, the undersurface of the chin and front of the neck and the front of the right thigh midway between the knee and hip.

Two attorneys testified on behalf of plaintiff that they had seen the dress and that the upper portion was burned but not the lower portion; that the dress was delivered to a testing laboratory prior to April 1958, but had been destroyed when the offices of the laboratory were remodeled in 1961. A can (Ex. 11) was identified by another daughter, Margaret Davis, aged twenty, as the can involved in the occurrence. There was testimony that another can (not Exhibit 11) was delivered to an Iowa attorney who sent it to the same testing laboratory in April 1958. No laboratory tests of either the dress or the can were submitted at the trial.

It is undisputed that Lanolin Discovery contained 5% alcohol and 88.2% freons, the latter being non-flammable fire-extinguishing propellants. Defendant acknowledges that no tests of flammability were performed on Lanolin Discovery. Its proof showed, how-

ever, that prior tests on hair sprays with 20% alcohol and 80% propellant content revealed that those products were not flammable and were in accord with existing regulations and it contends, therefore, that tests on Lanolin Discovery with only 5% flammable alcohol and 88.2% freons were unnecessary.

In 1959, when Susan was a little over nine years old, her discovery deposition was taken. No objection was made by plaintiff's attorney to her competency. SHA, Ch 110, § 101.19–9, Supreme Court Rule 19–9, provides in section (3)(a) thereof:

> Grounds of objection to the competency of the deponent or admissibility of testimony which might have been corrected if presented during the taking of the deposition are waived by failure to make them at that time . . . .

The objection was raised at the trial but the court properly held that he could not then inquire into conditions which existed two years before and that the objection to the taking of the deposition had been waived.

At the trial, when she was almost eleven, Susan was first called to the witness stand by the defendant as an adverse witness. Her competency to testify at this time was conceded after a qualifying examination. In response to almost all of defendant's interrogation concerning the occurrence in question she answered: "I don't remember." When the questions and answers from her deposition were propounded, she admitted that questions were asked and her answers given as read. A summary of these discloses that at the deposition she stated that at the time of the occurrence she was wearing a cotton dress, a cotton undershirt, cotton pants and cotton socks; that after she watched television she went into her mother's bedroom and sprayed some hair spray on the front and back of her hair and might have sprayed the back of herself; that she lit a birthday candle with matches;

47

that she held it in her hand and it melted; that the candle burned her fingers and it dropped on her dress and landed on the bottom of the dress and started to burn; that the bottom of the dress burned first.

During her examination under section 60 at the trial in answer to the question "Do you remember what it was that caused your skirt and dress to catch on fire?" she testified that it was a candle and that she got it from a buffet. On questioning by her own attorney as to what she recalled about the fire she said that she didn't remember whether, when she got burned, the top or bottom of her dress first started to burn. However, she testified that she did remember that she was lighting the candle "to see a light; a light in the ceiling; a little circle on the ceiling." In answer to the question "How do you do that?" she replied: "You hold it up and then you can see it."

Plaintiff contends that the use of questions and answers from the deposition was improper. Rule 19–10 of the Supreme Court (SHA, ch 110, § 101.19–10) permits the use of a discovery deposition "as an admission made by a party. . . ." However, plaintiff raises the question as to whether this applies to the deposition of a nine-year-old, relying on Knights Templars & Masons Life Indemnity Co. v. Crayton, 209 Ill 550 * where the court stated at page 563, 70 NE 1066:

> It may be further suggested that by mere admission infants are not bound. They can neither make them nor authorize any other person to make them for them.

---

* In this case the insurer sought to avoid liability on a policy on the ground that insured's death had been suicide and the company offered in evidence as an admission against interest, the deposition of one of the plaintiff's beneficiaries, a 17-year-old minor, given at the inquest of the death of the insured.

On the same page, preceding the above statement, the court said:

> This court has never held that the depositions taken at a coroner's inquest were competent evidence in such cases, . . . but the depositions, which are mere ex parte statements, would seem, upon principle, to be incompetent for any purpose other than contradiction.

Therefore it is obvious that the admissions in the Knights Templars case were excluded primarily because they were a part of the depositions taken at a coroner's inquest and it was the depositions as such which were sought to be introduced into evidence.

Plaintiff next cites Severns v. Broffey, 155 Ill App 10, in which the court excluded the admissions of a party previously adjudged non compos mentis on the authority of the Knights Templars case, supra.

Plaintiff cites Reed v. Kabureck, 229 Ill App 36, as authority for the proposition that admissions cannot be made by persons under fourteen years of age.

In that case a seventeen-year-old defendant was sued for assaulting with a gun and negligently shooting the plaintiff who lost an eye as a result of the incident. In passing on the admissibility of admissions made by the minor defendant, the court said, at page 40:

> The law in this State, following the common law, holds infants liable for their torts (citing cases). It would seem to follow, therefore, that if an infant is liable for his torts, any admissions that the infant might make in reference thereto, *if he be above the age of fourteen years,* should be admitted in evidence against him, . . . (Italics supplied.)

There is no authority for the age limitation used in that opinion. It seems to be based on a presumption

that tort liability commences at the age of fourteen. A recent case has sustained the theory of liability where the tort was wilful even though the defendant was under seven years of age. Jorgensen v. Nudelman (1964), 45 Ill App2d 350, 195 NE2d 422.

Both parties refer to Chicago City Ry. Co. v. Tuohy, 196 Ill 410, 63 NE 997, in which the playmates of a six-year-old boy were allowed to testify, without objection, to his admissions about how the accident happened after the boy himself testified that he did not remember. The following instruction was given:

> .... the admissions of a child of the tender age of plaintiff at the time of the admissions, if any are proved, should be received more cautiously on account of his age than the admissions of an adult, and the jury should weigh them with reference to his age and understanding; in other words, that even while admissions of an adult are received with great care and caution, those of an infant of the age of plaintiff at the time of the admissions must be received with still greater care and caution on account of his tender years and understanding at the time of the admissions. (Pages 430–431.)

The court said on page 431:

> We see no objection to this instruction. An admission, if it is legally an admission, must be made by some one legally capable of making the same. The fact, about which the child was questioned by these boys, occurred when he was less than six years of age, and his rights certainly ought not to be taken away by childish prattle indulged in by him when trying to explain the cause of the injury received by him.

Since both parties find solace in some of the language of this opinion, we would point out that testi-

mony at a deposition cannot be described as "childish prattle." An objective appraisal of Illinois cases was stated in Bankers' Trust Co. v. Bank of Rockville Center Trust Co., 110 NJ Eq 203, 168 A 733, at page 738:

> The rule in some jurisdictions is that "by mere admissions infants are not bound. They can neither make them, nor authorize any other person to make them for them." Knights Templars' Indem. Co. v. Crayton, 209 Ill 550, 563, 70 NE 1066, 1071. The prevailing and, it would seem, the better rule, however, is that the admissions of an infant are receivable, but are to be cautiously weighed. Atchison, etc., R. Co. v. Potter, 60 Kan 808, 58 P 471, 72 Am St Rep 385; Chicago R. Co. v. Tuohy, 196 Ill 410, 63 NE 997, 58 LRA 270; Gebhardt v. United Railways Co. (Mo Sup) 220 SW 677, 9 ALR 1076; 2 Wigmore on Evidence (2d Ed) 513; 1 RCL 488.

We therefore hold that the admissions of an infant party to a suit, made in a deposition, are admissible if the witness is competent.*

■ Plaintiff urges error in the admission of testimony that showed that defendant had received no complaints of injury from use of Lanolin Discovery. Since plaintiff's pleading charged that "the defendant knew, or in the exercise of ordinary care ought to have known, of the said flammable nature of said product," defendant contends that it was fit, as a defense, to show that it did not (and does not) have knowledge of the product's flammability, and to show further in support of this lack of knowledge that despite the sale of 11,223,263 cans of Lanolin Discovery over a period of

---

* As noted before, no question as to the competency of Susan as a witness was raised at either the time of the deposition or at the time of trial.

more than six years no complaints had been received except that filed by the plaintiff in this case.

In Monahan v. Economy Grocery Stores, 282 Mass 548, 185 NE 34, the court permitted evidence on behalf of the defendant "that out of a lot of seventy-two thousand cans packed by the particular packer and shipped to the defendant no complaint had been received as to any other can." Also, in dealing with prior accidents, McCormick, Evidence, § 167, page 354 (1954 Ed) states:

> The trend of recent decision seems to favor admissibility, and it is believed that evidence of absence of other accidents may be relevant to show, (1) the nonexistence of the defect or condition alleged, (2) that the injury was not caused by the defect or condition charged, (3) that the situation was not dangerous, or (4) *want of knowledge of, or of ground to realize, the danger.* (Emphasis supplied.)

We believe that the trial court did not abuse its discretion in permitting testimony of this character.*

■ Plaintiff further contends that the trial court committed error in various rulings on evidence. As we believe that all of the alleged errors related to matters which were within the discretion of the trial court, and that this discretion was not abused, we will only briefly treat plaintiff's objections. Plaintiff first contends that the witness, Babcock, called by plaintiff, was cross-examined, over plaintiffs' objections, regarding his familiarity or unfamiliarity with various federal, state, and trade regulations concerning fire prevention. In view of the fact that Babcock testified on

---

* The court instructed the jury that this testimony was admitted only on the limited issue of defendant's knowledge or lack of knowledge of the alleged flammable characteristics of the product.

direct examination that for forty years he had specialized in investigating fires and their causes, including flammable liquids and means of protection against fires, and that part of his work was determining what measures fire insurance companies should take with respect to flammable liquids throughout the United States, the cross-examination did not exceed its proper scope. The Supreme Court of Illinois in West Chicago St. Ry. Co. v. Fishman, 169 Ill 196, at page 200, 48 NE 447, defined the proper bounds for the cross-examination of an expert witness:

> A question, although it goes beyond the scope of the evidence, may be propounded upon cross-examination, if its office and purpose is to elicit the reason upon which the expert based an opinion expressed by him in his examination in chief, or to ascertain the extent of his learning and knowledge of the particular subject upon which he assumes to be an expert.

Also see Gard, Illinois Evidence Manual, Rule 237.

▌ Plaintiff also complains of the court's refusal to allow her witness, Fulton, a hairdresser, to testify that it was customary for manufacturers of hair products with flammable ingredients to place warnings on labels. It was brought out that although Fulton was a beautician, he had no knowledge of the ingredients of the twenty different kinds of "hair sprays" which he saw or used and which were labeled with some cautionary warning. It was not an abuse of discretion for the trial court to keep out this type of general testimony on custom and usage. Thompson v. Chicago & E. I. R. Co., 32 Ill App2d 397, 403, 178 NE2d 151; Werner v. Illinois Cent. R. Co., 309 Ill App 292, 304, 33 NE2d 121, reversed on other grounds, 379 Ill 559, 42 NE2d 82; Evanston Best & Co. v. Goodman, 369 Ill 207, 212, 16 NE2d 131.

53

Plaintiff also avers that the court erred in permitting the defendant's witness, Colburn, to testify concerning experiments he conducted by spraying Lanolin Discovery on cotton cloth without the same conditions of temperature and humidity as existed at the time of the occurrence. The witness testified (Record, at page 1717) that "it was room temperature in September" and . . . "humidity was not measured. . . . I didn't have anything in the room to control or change the humidity." If any special conditions existed at the time of the occurrence, plaintiff did not bring them out. Besides, when the admissibility of experiments of plaintiff's experts was sought, this statement was made to the court:

> We are not attempting to reduplicate the particular situation whatsoever. We are attempting to show the characteristics of this particular Lanolin Discovery . . . (Record at page 683).

The rule regarding the admission of testimony pertaining to experiments performed outside of court is well stated in 20 Am Jur Evidence, § 758:

> Evidence may be given of experiments and demonstrations made out of court and not in the presence of the jury upon the same principles which permit experiments to be conducted in the jury's presence. *It is a matter peculiarly within the discretion of the court to decide the admissibility of such evidence in the light of all the surrounding facts and circumstances.* (Emphasis added.)

We do not believe that the trial court abused its discretion here.

We have carefully studied the objections of plaintiff to eight of defendant's instructions. From the hectic maze of suggestions, countersuggestions and objections at the conference on instructions, we have ascertained

that to four of them (Nos. 8, 15, 27 and 33) there were only general objections.

In Gilman v. Lee, 23 Ill App2d 61, at page 68, 161 NE2d 586, the court expressed the rule:

> . . . It is the duty of counsel to point out specifically to the trial court wherein any Instruction objected to is faulty so that cases may be tried without a needless error and so that the trial court may have the benefit of the full research and advice of all counsel.

Instructions No. 3 * and No. 5 ** were opposed as being directory and not supported by the evidence. Plaintiff relies on language in Duffy v. Cortesi, 2 Ill2d 511, at 516, 119 NE2d 241: ***

---

* If you find that the injuries of the plaintiffs were not caused by or because of any negligence or carelessness on the part of the defendant, but were caused by some act entirely disconnected from any acts or conduct of said defendant, the court instructs you that the plaintiffs cannot recover damages for negligence against the defendant.

** If you find from your consideration of all the evidence that the defendant was negligent in one of the ways as charged by the plaintiff and that its negligence was a proximate cause of injury to the plaintiff, Susan Hardman, then the contributory negligence of Susan Hardman, if any, is not a defense to the defendant against the claim of Susan Hardman. On the other hand, if you find that the sole proximate cause of the injury to Susan Hardman was the acts or conduct of Susan Hardman and that the negligence of the defendant did not proximately cause or contribute to cause the injury to Susan Hardman, then Susan Hardman is not entitled to recover from the defendant.

*** In that case a minor and his grandmother were pedestrians and were struck by an automobile. The wording of the instruction that the injuries "were caused proximately and solely by a person other than the defendants" prompted the court to say at page 516: "The action of the child was directed solely against the defendant Cortesi, and it was his negligence which was at issue under the pleadings, and not the negligence of any other person. Hence, the instruction, by referring to injuries caused by a person other than defendant, injected an issue not involved in the cause."

Moreover, it is deemed harmful and serious error where a peremptory instruction assumes facts not in evidence, and incorrectly interprets the law. Woods v. Chicago, Burlington and Quincy Railroad Co., 306 Ill 217.

However, here the instructions were limited to the one defendant and in view of the defendant's evidence that Susan's injuries were caused by the dropping of a candle by Susan upon her dress thereby igniting the dress, this instruction was supported by evidence and was correct.

■ The court in Instruction 41 stated in substance that if the jury found that the use to which the product was put could not be anticipated by defendant and that it was safe if used for the purpose for which it was manufactured, the defendants were not negligent. This was a correct statement of the law and did not, as argued by plaintiff, single out any particular evidence.

■ Instruction 38 was a cautionary instruction with respect to the admission of evidence of the claims history of Lanolin Discovery. Since we have held that this evidence was admissible, there was no error in giving a cautionary instruction concerning it.

■ "Trial by Battle" has long been abolished, but the clashing of redoubtable protagonists in our adversary system provides a battleground for hard-hitting, relentless and ingenious tactics. In this three-week trial, ten motions for mistrial were made and denied—one of them based on the newspaper and radio accounts of an explosion at defendant's plant which occurred during the trial. To the barrage of partisan maneuvers and sharp counter-punches the judge reacted with patience and composure. In this atmosphere the jury heard the contradictions and the disparities between the witnesses and the various experts. An objective appraisal of all the evidence and all the happenings at the trial lead us to the conclusion that the

56

verdicts were not against the manifest weight of the evidence, that plaintiff had a fair trial and that the judgment of the Circuit Court of not guilty on the negligence issues should be affirmed.

Plaintiff also argues that it was error for the trial court to strike the four warranty counts in the complaint at the close of all the evidence. Counts III and IV alleged that Helene Curtis had breached an implied warranty that the product was reasonably fit for application to the human person. Counts V and VI further alleged that the advertisements for Lanolin Discovery, which described it as containing "100% Absorbable Lanolin," created an express warranty which was likewise breached.

Looking first to the express warranty counts, we must acknowledge that the trend of recent case law in other states seems to support plaintiff's general proposition that an express warranty may be created by the manufacturer of a product in favor of an ultimate consumer through advertising claims so familiar to us all. See, for example, Pollard, "Products Liability—The New Bonanza," 1 Illinois Continuing Legal Education 43, 51, and Comment, "Caveat Manufacturer: Advertisements As Constituting Express Warranties," 9 DePaul LR 236. Thus, in Rogers v. Toni Home Permanent Co., 167 Ohio St 244, 147 NE2d 612 (1958), plaintiff in suing a defendant-manufacturer for breach of an express warranty created by an advertising claim that the home permanent was absolutely safe, alleged that upon removing the curlers, as directed, she also removed her hair to within one-half inch of her scalp. The Ohio Court sustained a judgment in her favor upon the theory of breach of express warranty.

Plaintiff here avers that an express warranty was created by defendant's advertising claim that the product contained "100% Absorbable Lanolin." Even assum-

ing, arguendo, that this claim did establish an express warranty and that defendant would be liable for a breach thereof under Iowa law, we feel that the trial court correctly withheld these counts from the jury's consideration since no evidence was adduced at trial to show that the lanolin in Lanolin Discovery was anything other than 100% absorbable, as claimed.

The issue presented by plaintiff's further claim of breach of implied warranty of merchantability (Counts III and IV) is basically whether or not the product was reasonably fit for the ordinary uses of a product of that kind. This is the issue under both the Uniform Sales Act (§ 15) and the Uniform Commercial Code (§ 2–314). As stated by the Supreme Judicial Court of Massachusetts in McCabe v. L. K. Liggett Drug Co., 330 Mass 177, 112 NE2d 254, at page 256: "Merchantable quality means that goods are reasonably suitable for the ordinary uses for which goods of that description are sold."

 Defendant, however, argues that under Illinois law no action for breach of warranty may be maintained in the absence of privity of contract between the manufacturer and the consumer. It contends that Illinois law is applicable since its sales are all made in Illinois to distributors for eventual nationwide distribution,* and that under the traditional con-

---

* We shall consider defendant's argument as fully grounded on the record although the only evidence submitted on the question of where the sale was made was that of defendant's claims agent who testified on cross-examination [Add Ab 9]

MR. DOOLEY: Q. Mrs. Lundy, as I understand it you sell this particular product in the State of Iowa, is that correct?

A. We sell it in the State of Illinois.

Q. All right, and it is sold to retailers who, in turn, sell it to the public in the State of Iowa?

A. We make sales to wholesalers, retailers that they place their orders with. You see, we ship it at their direction. . . .

flict of laws rule relating to contracts the law of the place of execution or performance of the contract is to govern. Harris v. American Surety Co., 372 Ill 361, 24 NE2d 42 (1939).

In this case, however, the ultimate sale to the consumer was made at a drug store in Oelwein, Iowa. Many contemporary commentators have expressed the opinion that the law of the place of the ultimate sale should govern actions based upon breach of warranty allegedly caused by the distribution of defective products. See, for example, 2 Frumer and Friedman, Products Liability, sec 38; 2 Harper and James, The Law of Torts, sec 28.16. This view comports with logic and common sense, for it is basically unreasonable and unfair that the remedies of the injured consumer should depend upon the intricacies of sales law such as the shipping arrangements made between manufacturers, wholesalers, distributors and retailers all of which are totally beyond the control and knowledge of the consumer. Moreover, it is being increasingly recognized that social policy demands that the burden of accidental injuries caused by defective products be placed upon the manufacturer who may better protect himself against loss than upon the innocent consumer. See, Noel, Strict Liability of Manu-

---

Q. And that is sold to a distributor or to a retailer, or to a warehouser, for the purpose of resale in the State of Iowa? Is that correct?

A. It is sold to anyone who wishes to buy it for the purpose of resale throughout the United States.

Q. Yes, but I mean the people to whom you distribute it are not the public?

A. That's right.

Q. You distribute it—you send it to some person who in turn distributes it?

A. That's right.

facturers, 50 ABA Journal 446 (1964). According to Professor Ehrenzweig, Conflict of Laws (1962):

> The [consumer] cannot be realistically expected to consider the liability laws of each state whose products he may consume. But the producer could, though he probably usually does not, calculate his potential losses under the laws of each state in which his product may be distributed, and thus carry the burden of the most unfavorable "reasonably foreseeable" law. (P 591.)

See also, Prosser, Torts (2d ed 1955) p 506. The leading modern case of products liability, Henningsen v. Bloomfield Motors, Inc. (1960), 32 NJ 358, 161 A2d 69, applies the law of the place of the ultimate sale without discussing its rationale for so doing.

Furthermore, Iowa law would seem to be applicable under the conflict of laws-tort principle, i. e., as the law of the place of the injury. Chicago & E. I. R. Co. v. Rouse, 178 Ill 132, 52 NE 951; Waynick v. Chicago's Last Dept. Store (7th Circuit, Illinois, 1959), 269 F2d 322, cert denied, 362 US 903; 34 ILP, Torts, § 6. Applying the law of the place of the injury in suits for breach of implied warranty is not inconsistent with tradition for, as Prosser states:

> The preoccupation with contract in connection with warranty has no sound foundation. The action for breach of warranty was originally a tort action, for breach of duty assumed, and it is by no means clear that it was anything more than the [sic] accident that the cases which arose involved contracts which led to its being regarded as a matter of contract at all. (Torts, p 507.)

This principle has also received judicial recognition in McQuaide v. Bridgeport Brass Co. (USDC, Conn, 1960), 190 F Supp 252; Greenman v. Yuba Power Prods., Inc., 59 Cal2d 57, 27 Cal Rptr 697, 377 P2d 897

(1962). Nor is such an interpretation of the warranty action inconsistent with Illinois law. The frequently cited case of Greenwood v. John R. Thompson Co., 213 Ill App 371, states at page 374:

> The ancient remedy for a false warranty was an action on the case sounding in tort. The remedy by assumpsit was adopted later and apparently to enable the pleader to be in a position to add the money counts. Schuchardt v. Allen, 1 Wall (US) 359, 368; Vanleer v. Earle, 26 Pa St 277, 279.

Moreover, Iowa law would be applicable under the modern "center of gravity" rationale of conflict of laws, whether considered under the tort[*] or contract[**] theory.

The recent case of Bowles v. Zimmer Mfg. Co., 277 F2d 868 (7th Circuit, 1960) was factually similar to the case at bar in that there was a sale of a surgical pin by an Indiana manufacturer to a Michigan distributor upon the latter's mail order. The distributor, in turn, delivered the pin to a hospital where it was inserted in the plaintiff's leg. The pin proved defective and the plaintiff sued the manufacturer in the Federal District Court in Indiana. In affirming the trial court's refusal to direct a verdict for the defendant on the implied warranty count on the grounds that the privity requirement of Indiana law had not been satisfied, the court, at page 873, quoted with approval from an Indiana case:[***]

> The court will consider all acts of the parties touching the transaction in relation to the several states involved and will apply as the law govern-

---

[*] American Law Institute, Restatement of Conflict of Laws 2d (tentative draft No 8, 1963) sec 379.

[**] Id., (tentative draft No 6, 1960) sec 332.

[***] W. H. Barber Co. v. Hughes (1945), 223 Ind 570, 63 NE2d 417.

ing the transaction the law of that state with which the facts are in most intimate contact . . . (S)everal courts, without consciously following a rule such as we have attempted to formulate, have considered and appraised the contact points and in the several decisions applied the law of the state with which the transaction was found to be the most closely associated.

Applying these criteria, the Court of Appeals for the Seventh Circuit found that Michigan was the state most closely associated with the transaction and accordingly upheld the application of its law under which privity was no longer required. *

We reject the application of the old conflict of laws rule relating to contracts in this case involving a question of an implied warranty on the sale of a nationally distributed product to an ultimate consumer. By following any of the three conflicts theories discussed above, i. e., the law of the place of the ultimate sale to the consumer, the law of the place of the injury, or the law of the state with the most intimate contacts with the transaction, it is apparent that we must here apply the law of Iowa.

Under Iowa law the questions of the existence and breach of an implied warranty are recognized as questions of fact, Reed v. Bunger (Iowa, 1963), 122 NW 2d 290; Farmers State Bank v. Cook (1960), 251 Iowa 942, 103 NW2d 704; Rowe Mfg. Co. v. Curtis-Straub Co. (1937), 223 Iowa 858, 273 NW 895. Defendant's argument that there was no privity of contract is un-

---

* It has even been proposed that the concept of an "implied warranty" be totally abandoned as a fiction and the liability of the manufacturer recognized as one of strict liability in tort imposed as a vehicle of social policy. American Law Institute, Restatement of Torts 2d, Sec 402A, "Special Liability of Sellers of Products for Consumption"; Walter V. Shaefer, "Drugs and the Common Law," in Drugs In Our Society (Johns Hopkins Press, Baltimore; 1964) ; Prosser, Torts, p 510.

availing since, under Iowa law, the requirement of privity has been abandoned. State Farm Ins. Co. v. Anderson-Weber, Inc., 252 Iowa 1289, 110 NW2d 449, 456 (1961).

■ ■ The essential question presented by a claim of breach of implied warranty of merchantability is whether the product failed to safely and adequately satisfy the uses to which such products are ordinarily put. The question of what is an ordinary use, however, is clearly one of fact. Thus, a recent article in the Yale Law Journal, in discussing the liability of a manufacturer for failing to foresee the possibility of danger from an unorthodox use of a product, stated:

> While there is no obligation to anticipate abnormal uses of a product, the abnormality of a particular use may be a close question. Moreover, there ordinarily is no duty to anticipate careless use, but where the use is by a person not familiar with the dangers of the product, the matter of foreseeability of the use may be a question for the jury. . . . *The problem is to determine whether or not the use of the product involved was in fact so unintended and unforeseeable that the case should be taken from the jury.* (Emphasis added.)

Noel, Manufacturer's Negligence of Design, 71 Yale LJ 816, at 855–56 (1962).

One of our problems on the facts before us, therefore, is whether we can say, as a matter of law, that the use of the Lanolin Discovery in a manner not contemplated by the manufacturer, to wit, use by a small child of a product designed as a hair conditioner in quantities greatly in excess of those recommended by the manufacturer, on her dress as well as her hair, simply because she liked to smell the perfume it contained, constitutes so abnormal and unanticipated a use as to place it without the protection

of the implied warranty of merchantability. The article by Professor Noel, cited above, continues at page 858:

> A stronger case for unusual use can be made out where a youngster of five splashes inflammable fingernail polish over his clothes and then sets fire to himself, or where a child of nineteen months drinks poisonous shoe cleaner with fatal results, but *it would seem that even in these cases it should not have been ruled as a matter of law that the abnormal use was unforeseeable.* A jury perhaps could find, without being unreasonable, that such uses by small children could be anticipated when the product is not labelled as inflammable or poisonous so that—like matches or medicines—it will be kept out of reach . . . . As stated in a standard treatise, whenever the foreseeability of the abnormal use is doubtful, "it will be a *question for the jury* whether the maker should have anticipated it." (Emphasis added: footnotes omitted.)

Although the cases cited by Professor Noel are, strictly speaking, negligence cases, we believe that their logic is compelling here since the question of what is an ordinary use is as much a question of fact as is the question of what is a foreseeable use. We believe there was sufficient evidence to warrant presentation of this question to the jury if there was also evidence that Lanolin Discovery was flammable.

As to this, we believe that there was testimony which, when taken in the light most favorable to the plaintiff, tended to establish that the product was flammable. Therefore, despite whatever may have been the weight of contrary evidence, this issue of implied warranty should have been presented to the jury. See Zide v. Jewel Tea Co., 39 Ill App2d 217, 188 NE2d 383.

We are, therefore, compelled to reverse the court's striking of Counts III and IV of the Second Amended Complaint and remand to the Circuit Court of Cook County for a new trial on these counts. The striking of Counts V and VI, however, is affirmed and the judgment on the jury's verdicts as to Counts I and II is affirmed.

Affirmed in part and reversed and remanded in part.

ENGLISH, P. J. and McCORMICK, J., concur.